Next case is LEADER TECHNOLOGY v. FACEBOOK 2011-13-66. Mr. Josepher, get ready when you are. Good morning. The key legal question on this appeal is what constitutes clear and convincing evidence. The legal question isn't the question whether there was substantial evidence before a jury? Well, the question was whether there was sufficient evidence from which the jury could find if there was clear and convincing evidence of the timing question. And the reason I said it's a legal question is you then have to know what does it mean for evidence not just to be some evidence or even a fair amount of evidence, but clear and convincing evidence. And on that point, the key underlying issue in dispute here is the exact issue is when did leader to leader first embody the patented invention, before or after the critical date? Wasn't that a question for the jury? If there's sufficient evidence to go either way, yes. But the whole point of judicial review of jury verdicts is to ensure that there is sufficient evidence, especially under the clear and convincing standard. And on that point, Facebook chose to rely on an attack on the credibility of leader CEO, Michael McKibben, and on an interrogatory response that just didn't address the question. And as a matter of law, that gives rise to at most speculation or surmise, not the kind of hard facts that are required for clear and convincing evidence. Under any other conclusion, you'd effectively be nullifying the clear and convincing standard. On page 21 of your opening brief, you say that the improper attempt to shift the burden of proof to leader only confirms Facebook's fundamental failure to carry its own burden. And you cite to Pfizer for that proposition, saying, quoting, burden of proof never shifts to the patentee to prove validity. In Pfizer, we go on to say that a patentee, quote, would be well advised to introduce evidence sufficient to rebut that of the challenger, but that doesn't shift the burden. There's two different things. It seems to me that if Facebook met their burden initially with their cross-examination and their argument about interrogatory response and some other things that the district court judge discussed, both in the body and in the footnote, wouldn't you have been well advised to submit rebuttal evidence, such as the source code in the jury? You make a huge argument about Facebook's failure to submit that source code, but you could have done it, couldn't you? I mean, the fact that we're here kind of answers the question that, sure, if we put other stuff in the record, maybe we wouldn't be here, right? But that's frankly always true in every appeal I've ever argued that, gee, if the specification had been a little more specific. But the reasons that we didn't do any more are a few things. First, remember, Facebook at trial was raising a lot of different issues, including invalidity issues. And on every other one, so we had to make decisions on every other one, it had an expert presenting an element-by-element analysis based on technical data. So this one, where it didn't, and where it was just relying on witness testimony when both witnesses' direct testimony and points supported us, didn't seem to be one where we were going to be spending a lot of time at trial on. So it's a lawyer decision at trial. Well, in part, because again, this is what burdens of proof are for. You find out what they're putting on, and you decide how to use your time to respond to it. And here, all they were doing was attacking our witnesses who testified in our favor, and then looking to an interrogatory that really didn't address the question. And if you read the closing arguments of the district court's JML decision, they make it really clear that that's what Facebook was relying on. Well, they're looking at that testimony at trial, live testimony. They're looking at that interrogatory response, but they also got a deposition response that seems to be directly contrary, and they're relying on that. And that's part of the credibility, though, because what Mr. McKibben testified to in his deposition was that he said, well, that was a long time ago. I don't specifically recall, but other people keep track of that information. Now, if the jury wanted to infer that, well, if he didn't recall then, and he recalls now, he must be lying now, that goes to the credibility attack. You could throw out his testimony for that reason, as the jury instructions told the jury that's what they could do. But there's no – again, there's no affirmative evidence from that first deposition. Mr. Christopher, in the context of the fact that this is a jury verdict, we're not talking about a little slip here. This had been under development since, what, 1999, and the critical date was 02. And they were demonstrating this to various parties, Wright-Patterson, Boston Scientific, the Limited, and at least two of these parties agreed to buy it. Wasn't this clearly on sale? And when you couple this with a testimony where the key witness was simply unsure of dates, why wasn't the jury allowed to make its decision and reaffirm it? Well, the point is to keep track of what this is, and that's the critical issue, is there's no dispute. I mean, for purposes of appeal, there's no dispute that the evolving leader-to-leader product suite had been subject to barring activity. There's no dispute that the patented invention is something that they've been working on for a while. The question is, when was the patented invention completed, put in the invention, publicly demonstrated, offered for sale? And you said right around the time of December 11th. I mean, that almost sounds like targeted. It was right after the critical date, and the jury didn't believe them. Well, it was targeted because of the provisional. Remember, the idea here was they thought that the provisional needed to be enabled, so they thought that to file the provisional, they first needed to complete the invention. Joseph, you've got to slow down. You talk so fast, and I talk fast, but I'm having trouble following you, so please slow down. Thanks for the reminder. I appreciate it. It's good to know. What they did is the testimony was that they knew that the provisional had to be enabled, so they filed the provisional just a day or two. It's good to know, but you're not doing it. I'm sorry. You're at the same speed you were a few minutes ago. So what they did is they filed the provisional right after they had reduced it to practice. They then filed the final application just under a year from the provisional. There's nothing devious about that. And so the point is that then what you've got is the critical date and the product being reduced to practice are basically at the same time. Now, what Facebook argues, and again, there's no evidence to the contrary, just innuendo speculation. It also makes sense. It's kind of the point of a provisional. But what Facebook is arguing then is that, well, there may have been like a two-day window before December 11th of 2002 in which you had a reduction of practice, but the critical date hadn't kicked in yet. But even for that, and this is what the district court's footnote went to in its opinion, there's just no evidence either that the patent invention was – well, there are two things about that. One is what they're looking at is an email from December 8th discussing efforts for sale of leader-to-leader before then. And one, that's the first of things before then, not after then in that two- or three-day window. But second, again, the email, like everything else, just talks about leader-to-leader, not about the patented invention. And the whole point of the clear and convincing evidence standard is that you need actual evidence and sufficient evidence. And if you look at this court's decisions in Eli Lilly and in 3M, there was real evidence there. There was real evidence to support the jury verdict, but this court held it wasn't clear and convincing. If you look at the Supreme Court's decisions in Barb Wire, which is the patent case, or Nikki Shalva, there was a ton of pieces of evidence. More than 20 witnesses testified in the Barb Wire case. But the Supreme Court held the question isn't whether you have some evidence. It's not whether you have a lot of evidence. It's whether you have clear and convincing evidence on a relevant question. And here, their entire theory at trial was unnecessarily to try to draw an inference that's just not true. And the source code is really important. If I could get back to how Facebook would have proved this issue at trial if it was actually right. During discovery, we've compelled the source code, and the court granted the motion to compel us to produce the source code on the ground that that's the only way Facebook could figure out whether leader-to-leader actually practiced the patented invention. We produced the source code. They reviewed it, and guess what? No one ever heard anything about it again. And then they put no expert testimony in on it. Also, during discovery, before they noticed depositions of our customers, to ask the customers what was offered for sale, what was demonstrated to you. And they canceled those and didn't take them. So all the ways you would actually prove a theory at trial, and how Facebook did try to prove its other defenses at trial with real evidence, Facebook chose not to pursue. Mr. Driscoll, you're on the horns of a dormant. You keep saying real evidence. You can't really say to this court with a straight face that testimony by a witness is not real evidence. But the testimony supports us. When the witnesses, the two witnesses, McKibbin and Lamb, when they were directly asked, the question about whether you can conflate the patented invention of leader-to-leader, whether they're the same, they both testified no. That's correct. That testimony says something. And if a trier of fact looks at that witness and says, look at him. He's got his hands up in the air and his palms raised to the ceiling. He's looking with his eyes. And they make a record of that. And they say, obviously, he's lying to me. That's real evidence, too, is it not? The demeanor of the witness? This is the point. It's evidence that allows the jury to, according to jury instruction and about 24 cases cited in their brief, to disregard the witness's testimony. It's not affirmative evidence that the contrary of what the witness testified is true. Pardon my Latin, but I seem to recall something in law school that says falsus in uno, falsus in omnia, something like that. If you're lying about one thing, there can be a presumption that you're lying about everything. For purposes of this appeal, under the standard of review, we're not disputing. The jury could conclude that McKibben lied about everything he said. You can just toss all his testimony out. That's a different point. The point, though, is that, and this is, you know, Niki Schiavo, again, this is a Supreme Court case, right? I'm pointing to clear and convincing. That just means you can throw the testimony out. For summary judgment in JMOL to mean anything, the party with the affirmative burden of proof still has to have their own affirmative evidence. And their affirmative evidence is that there's sales negotiations going on with Wright-Petterson Air Force Base, with the gap, or the limited, with one other, Boston Scientific, and that the testimony by your key witness is, no, we didn't have the patent incorporated in the leader-to-leader at that point. You can take those two things together, and then you take the evidence that they put on, that an interrogatory answer, that you say, oh, no, it was only directed at this time, and they say, oh, yeah, well, if you answered it that way and you meant it that way, you should have explained it. Sure. A couple things. All of that other evidence about barring activity, again, that all relates to leader-to-leader. The only, I agree with you about going to the interrogatory, because the only thing that they really have used to try to tie patent intervention to leader-to-leader, such as the barring activity would actually relate to the patent intervention, is the interrogatory response, which does not. No, there's a deposition response as well. That he didn't remember at the time. And he said, other people keep – again, you can throw out his testimony, but under the case law, you throw out his testimony. What do they have left is the interrogatory. I would like to – I want to ask you, and I'm going to couch this by saying it's a friendly question, so just listen to it, okay? If you were trying to prove infringement, forget about clear and convincing evidence, just preponderance of evidence. You're trying to prove infringement. Can you establish your case by simply calling the defendant to the stand and asking the defendant whether or not he practices all the claims, having him say no, and say, ah-ha, jury, I've established my case. I've suppressed my case. Exactly. And that's preponderance of the evidence. Correct. Your view is you sure can't do it in a clear and convincing, right? Exactly. And so the question then, and that's what summary judgment and JML are for. So the question then is what else do they have on the key question? Not on leader to leader, on the key question of when the patent and invention was in leader to leader to help them connect the dots. And on that, it really does all come back to the interrogatory. And the reason that's not even close to clear and convincing is three things. First, the question asked in the present tense, does leader to leader – what products embody? And the answer is in the present tense about embodies. This is years later. Second, the present tense is not an accident. Because at this point in time, remember, Facebook hadn't flipped its theory. At that point, Facebook was still arguing that leader to leader is currently falsely marked. Well, the interrogatory – you're going so fast again, so I want to make sure that I understand your point. Your point is the interrogatory says for each claim, tell us that leader contends is practiced by any product. You're saying we answered it honestly. We said leader to leader practices this. It doesn't mean leader to leader at all times practices it, right? And that wasn't – right. That's your point. I just want to make sure I understand your argument. Yes, and there's a reason for that. It wasn't like we were trying to hide something. The reason is the present tense was technically important because at the time, Facebook was asserting a false marking defense where the present tense is what matters. They never asked you by interrogatory at what point you started to offer the product that embodies the claim? It might be a standard interrogatory that I would expect to see, but I didn't see it cited. Right, and they did ask one other interrogatory at the same time as this one, which is important, and that was a – And they had the false marking claim, which is probably why they wanted in the present tense to know which of your things actually did. Exactly. If we'd answered that in the past tense, they would have said it was not responsive, and they would have been right. Because it was related to their false marking claim. False marking, exactly. That's why they wanted it in the present tense. And they did observe at the same time a separate interrogatory concerning prior uses, in which we answered truthfully that there were none. So in context, it was clear that that interrogatory was about the present for false marking. They had a separate prior use interrogatory response that they don't talk about a lot. And it also bears emphasis that because of the false marking, they were arguing all along until the end of discovery that Leader 2 Leader did not embody the patented invention. And when they pulled this 180-degree switcheroo shortly before trial, we're not raising that as a procedural objection. But when the question is, why is the party that did not bear the burden of proof by clear and convincing evidence did not have more, the answer is, well, right before trial, they changed this. And then of all of their theories, this was the one that didn't even have expert or technical evidence on. So why would we have done more or could we have done more at that point? But the record doesn't contain everything surrounding the interrogatories. It just has that page or pages. Were there definitional provisions or anything that required you to expand your response at any point? No. And again, because at the same time, they filed a separate prior use interrogatory. I mean, look, it's a matter of just general updating law, right? With this being a false marking question about embodies, if the answer to embodies for false marking purposes, the current version had changed, I'm sure we would have updated that. But since it wasn't directed at that and there was a separate prior use question, there was no need to update that because the prior uses were what they were. Joseph, you've consumed your total time, but you've gotten a lot of questions. We'll give you two minutes for rebuttal. Thank you. Mr. Hunger. Thank you, Your Honor. May it please the Court. Thomas Hunger for Appli Facebook. With respect to what Mr. Josepher described as the key issue, when did leader-to-leader first embody the invention before or after the critical date? There are a number of pieces of evidence that support the jury's finding in favor of Facebook on that issue. In the first place, Mr. McKibbin testified that even under his version of the events at trial, the invention was fully complete, done, fully coded, and part of leader-to-leader, a plug-in to part of leader-to-leader, before, a few days before he said the critical date. He's your other tech argument. In part, Your Honor, yes. But actually, it goes beyond that. No, what was offered for sale. It actually goes beyond that, Your Honor, because on December 8th, which is obviously within a few days before the critical date of December 10th, 2002, on December 8th, 2002, Mr. McKibbin sent an email in which he described the current state of their negotiations with both the Limited and Boston Scientific. And in that email, he specifically said, looking to a contract that they expected to sign in January with respect to the Limited, that what they were offering to Limited was leader-to-leader with, quote, the full suite of technology, close quote. December 8th, that's two days before the critical date, within the time period when even under Mr. McKibbin's own testimony, the invention is done, complete, part of leader-to-leader, that's at 25705 of the joint appendix, and they're offering the full suite of leader-to-leader. Well, six months before that, if there was a leader-to-leader program, right? Yes, Your Honor. If they had offered it for sale to someone, wouldn't they have said, this is our full suite of technology? Actually, you're referring, I think, to the Wright-Patterson offer in January of 2010. In that offer, they also used language making clear that leader-to-leader with digital leaderboard, and that's important, is operational and fully developed. That's what the January of 2010 offer to Wright-Patterson says. And remember, their own, again, Mr. Lamb, the other inventor's own testimony, relies on an August 1999 email as evidencing the conception of the invention, of the patented invention. In August of 1999, that email refers to the invention as, quote, digital leaderboard. So we have the name of the invention in 1999, digital leaderboard with leader-to-leader is being offered in January of 2002. So that, we submit, provides clear and convincing evidence of what was being offered at that point. And of course, the interrogatory, when they describe what practices the invention, again, they say leader-to-leader with the digital leaderboard engine. So the digital leaderboard evidence provides an additional ground for finding this, upholding the verdict. In addition, I'd like to point out Mr. Lamb's testimony. To be sure, he testified as Mr. Josephers suggests, but the jury didn't have to believe the testimony that supports the other side's version, and he also testified separately. He said that the technology took a couple of years, maybe three, to implement after conception date. Mr. Hunter, suppose that all this other evidence that you're referring to didn't exist. I just want to try to focus on principles of law. There's no interrogatory responses. There are no emails. There's nothing. Yes. Do you agree with sort of the relative outrage that somebody couldn't just call the inventor to the stand and say, disbelieve him, and thereby I've met my clear and convincing evidence burden? I agree. That's correct, Your Honor. Do you agree that if all that other stuff didn't exist, but you're saying this is not that case? Yes, that's absolutely right. On that case, the jury is entitled to disbelieve, and that can be – that is affirmative evidence, as the Supreme Court said in Reed, the Third Circuit said in Urban, which is a criminal case. So certainly in a civil case, even one subject to the clear and convincing evidence standard, it is affirmative evidence, but it's also clear that standing alone is not enough to get over the burden. But it does serve as additional evidence to support the other evidence in the record, and here we have ample other evidence in the record that confirms that what they were offering was the patented technology. But I'm troubled by the interrogatory responses providing that theoretical affirmative evidence because the interrogatory responses were couched absolutely in the present tense, and given the presence of your false marking claim, it seems to me you were going after very much what are you selling today that embodies these claims, and how long have you been selling it in that form? I mean, that's a standard interrogatory I've seen in most patent cases is when did you start selling it as it embodies the claims, and that interrogatory doesn't seem to have been presented to us. So I want to know what your thoughts are about the interrogatories because certainly the district court relied on – the district court only cited two things as the evidence substantiates the jury verdict. He cited these interrogatories, and he cited the testimony that was disbelieved. So you're pointing to other stuff, but what do you think about the interrogatories? Let's go piece by piece. Okay. Although the district court actually did point to other evidence, and there's a footnote where he goes through other evidence, which we also remember. The footnote of conception. Yes, the evidence of conception in the footnote. But also the testimony that I referred to where they admit – they themselves admit even at trial that the technology is done and part of the leader-to-leader before the critical date. We used to practice prior to the critical date. Yes. Okay. And again, they also admitted that it's part of a plug-in to leader-to-leader at that time once it's completed. But putting that aside, with respect to the interrogatory, Your Honor, again, we don't have just – even if you're looking at the interrogatory, you have to take into account Mr. McKibben's testimony. No, but I want – I mean, the interrogatory is a legal response, and it says, is practice. Yes. I mean, how in the world could that ever be used to support the notion that it was practiced 10 years earlier? Well, Your Honor, when you're talking about a product, the product is leader-to-leader. We know that leader-to-leader was on sale. They disputed it at trial, but now they concede for purposes of appeal that it was on sale prior to the date, and they admit without qualification, leader-to-leader practices the patent. Okay? Now, it's true it is in the present tense, but it is certainly evidence from which a jury can infer that, well, it practices the patent. They didn't say there was ever a time when it didn't practice the patent. So if it's leader-to-leader, it seems like it practices the patent. But then when you add to that, we noticed a 30B6 deposition of – and they put up Mr. McKibben to testify. Mr. Hunker, suppose this was turned around on infringement. How would you like it if your interrogatory said our current version of leader-to-leader – or it doesn't say current, but it says leader-to-leader practices the claim. Do you admit it? And then they say, therefore, we're entitled to get damages for all years that you've ever sold this. And you say, wait a minute, time out. It didn't always have this form. I mean, this is software. This stuff is changing every single day. Well, it may be. I mean, it's not like – this isn't like Microsoft Word where you have a different version coming out. It's not like there's something called version one of leader-to-leader and version two of leader-to-leader. There aren't any documents that say that. It's always been called leader-to-leader. Digital leaderboard, right? It had a whole different name when they added the – That's part of – that's always described as part of. That's the functionality that's at issue. Yes, and that's the functionality – Give it a separate name. That was part of the offer in 2002. The name was never mentioned in those earlier offers. That's not correct, Your Honor. In the January 2002 offer to Wright-Patterson, they specifically referred to digital leaderboard being part of the system and fully operational. That's the – Is that part of the critical date? Yes, Your Honor. That's January 2002. The critical date is December 10, 2002. I do think the appellant raises a good question. Why shouldn't you put in the code? I mean, it's a question I ask appellants counsel too, but – Your Honor, the whole argument about the code, of course, has nothing to do with the record before the jury. They claim in their brief that, oh, we gave them all the copies of the source code. There's nothing in the record before the jury to that effect. In fact, there's nothing in the record to that effect. The only thing the record says is we'll give them what's available. So my understanding, not that this is in the record, but my understanding is, in fact, we did not have – we're never given a pristine copy of the code as it existed before the critical date. But whether – you know, that's all neither here nor there. The question is what was in front of the jury. There's no case from this court that says you must offer the source code. In fact, the standard is any relevant evidence. Just as Mr. Josepher said, when you have a lot of issues to try, a lot of different factual issues, and here you've got the admissions of the party opponent on the critical issue that you can give to the jury, why try to complicate matters further by trying to introduce technical evidence, particularly if, in the case of source code, it's often the case you just can't get it because – Why didn't your expert testify on it? Well, again, Your Honor, my understanding – this is not in the record – but my understanding is we were never given a pristine copy of the source code as it existed before the critical date, so it wouldn't have been in a position to do it. Also – What does that mean, pristine? Did it have a coffee stain on it? I mean, what does that mean? What were you doing? Without any additions – without any changes made afterwards. But whose obligation is it to get the discovery from them that you want? It's yours. You've got to file the appropriate interrogatories. You've got to file the appropriate requests for documents. Your Honor, we filed a 30B6 notice, as I was saying earlier, and it specifically addressed question after question that we want to know every version, at what time was conception, at what time was reduction to practice. We're going to ask you about every version that practiced the patent and when. And do you believe they failed to comply? And if so, why didn't you move for a motion to compel below? Your Honor, we asked – No, you're up here on appeal complaining that you didn't have a pristine copy. I have no clue what you even mean by that. And that that somehow justifies why you didn't include it as any of the evidence. I'm not complaining, Your Honor. I'm simply answering the question about why it is that we chose to try the case in a different way, which trial counsel, as Mr. Joseph said, have to make judgments about what's going to be most effective in the limited time available. And that's the reason, or one of the reasons why we tried it that way. But with respect to the 30B6 deposition, Your Honor, the 30B6 deposition notified them, and this was in February of 2010, some five months before the trial. The notice said, we want to talk about these issues, reduction to practice, and which versions of the software practiced the patent. And so we asked Mr. McKibbin, can you identify any version of leader-to-leader that didn't practice the patent? He can't identify any version. That combined with the interrogatory response, those two facts in and of themselves provide strong evidence that if the inventor and president of a company can't identify any version that didn't practice the patent, and they've given an unqualified answer that says it does practice the patent. Did he say he can't identify anything, or did you ask him specifically at which point in time a different version that didn't have these features existed, and he responded that he couldn't recall? The question was, can you identify any iteration of the leader-to-leader process? Can you tell me what page you're on? 25761 of the Joint Attorney. Can you identify any iteration of the leader-to-leader product that, in your opinion, did not implement what's claimed in the 761 patent? Answer, that was a long time ago. I can't point back to a specific point. That's a timing question as opposed to a response that there never existed one. He's not saying that his response is not an acknowledgement that leader-to-leader has always embodied these technologies. And you agree it doesn't. At all times, leader-to-leader, when first put on the market, didn't have the digital leaderboard in it. No, we don't agree, Your Honor. To the contrary. The first offer in the record is the offer to Wright-Patterson where they specifically say it has digital leaderboard. That evidence standing alone is sufficient to support the jury's verdict. So which page did you say it's on? 257 – I'm sorry. 25761. And the – 820. That's in Volume 2 of the Joint Appendix. And the Wright-Patterson offer, which refers specifically to digital leaderboard, is Defendant Exhibit 179, and the references to digital leaderboard are at 27202 and 27204, perhaps among others. And, again, it specifically talks about leader-to-leader with the digital leaderboard system and how it's going to provide a collaboration environment. It's operational. It's already developed. And this is well before the critical days. So, Your Honor, that evidence as well, even if you leave the interrogatory response completely aside, which, of course, you can't do, reading the evidence most favorable to the verdict, but even putting the interrogatory response aside, that other evidence provides clear and convincing evidence of invalidity. Can I ask you a quick question about your divided infringement alternative grounds for affirmation? Yes. The claim says a computer-implemented method of managing data comprising computer-executable acts. The key phrase, it seems to me, is computer-executable acts, which comes after the word comprising. Yet you all claim it's part of the preamble, and somehow Mr. Josepher didn't respond to the contrary, but do you know the NPEP and pretty much all patent law books say that the transition phrase comprising is the end of the preamble, and these words come after it. So I don't see that limitation as being part of the preamble. I see it as the body of the claim. Well, even if that's true, Your Honor, the fact remains that do you question whether that's true, or are you certain as you stand here what portion of this claim represents the preamble? Well, my understanding of the preamble is it's what comes before the list of the body of the elements of the claim that are— Do you know what a transition is that comes after a preamble at the end of the sentence? Yes, comprising would be a transition, yes. Right, comprising, consisting of, consisting essentially of. Because the NPEP actually defines all this in case you have a case to look at. Right, I've looked at it, Your Honor, and I understand that comprising is a transition term. Our understanding of this question is, as it set forth in the brief, but as we also argued in the brief, whether or not you view that as limiting or applying to the claim, the fact remains that in the final step they add a user step, and you can't give meaning to those words. I mean, this Court again and again, considering similar language, has concluded that requires third-party user action, and it's not, therefore, something that Facebook can do. Well, it says dynamically updating the stored metadata. Is that the limitation? No, it says that, which clearly the system can do, but then after that you have the where-in clause, which introduces an additional limitation. The user employs at least one of the application and the data from the second environment. That requires the user to do something, and therefore the Facebook system must do something and the user must do something. And ultimately what the user does is going to result in some computer execution. So again, even if you're reading computer executable in, that's still happening, but the user has to do something. That's unambiguous language requiring user action, and therefore you have to prove joint infringement, and the jury found against them on that. Thank you, Mr. Hungar. We've had your argument. Mr. Josepher has a couple minutes left. Thanks. Let me just start out. If you take the evidence that Facebook has proffered and you remove two things, one is McKibben on the theory that he lied, but as Mr. Hungar said, that's not going to get you there, and you take out the interrogatory for the reasons that we've been discussing with Judge Moore, the answer is what would be what? And the answer is nothing that would even be near clear and convincing evidence. And we know that in part because the district court in this Jamal opinion relied solely on the combination of those two things. And then the footnote, you know, it dropped the footnote, but it said it was relying on those two things. He freed the closing argument. Facebook was pounding credibility all along. So we've now gone from Facebook arguing credibility as the linchpin of its case below to saying here, ah, there's lots of other stuff, don't worry about credibility. And the bottom line is that all this other stuff they're arguing now is either waived because it wasn't presented below or is wrong, or both. For example, Digital Leaderboard now seems to be their key effort to try to tie leader-to-leader to the patented invention. You read the entire trial transcript, you won't see a single description of what Digital Leaderboard is, much less a clear or convincing one. The reason is that's not what Facebook was trying to prove its case on below. The correct answer, which, again, you're just not going to find this in the record, but the correct answer, if it's helpful to the court, is that Digital Leaderboard is the software component, the engine, that drives the overall leader-to-leader product. Leader-to-leader is an evolving product. Over time, whatever happens to include in it, the software component, will now be included in Digital Leaderboard, which is why the phrase is leader-to-leader powered by the engine. So you agree that Digital Leaderboard refers to the plug-in that is really the functionality issue here? No, that's our point. Whatever software leader-to-leader... No, but that's our point. I don't understand what that means. No, we don't at all, and there's no evidence that it is, because this is the key thing. The problem is, from the jury, you read the trial transcript, there's no description of Digital Leaderboard, because there's no evidence on this. Going outside of the record, this is what it is, and we would have explained this if they'd actually raised the point at trial. Digital Leaderboard is just the software module, or the engine, that drives the entire leader-to-leader product. Digital Leaderboard is the software module. So, before the patented invention was in the product, you had a leader-to-leader powered by Digital Leaderboard, and the Digital Leaderboard was the software module for the product. After you later complete the patented invention and put it in the product, the patented invention is then in the software part of the software. It goes into Digital Leaderboard, for sure. But Digital Leaderboard is not synonymous with just the patented invention, any more than leader-to-leader is synonymous with just the patented invention. But the reason that, as a appellate court, you really don't have to try to sort through all of these convoluted, connect-the-dots factual theories, is that, one, they weren't presented below, and two, they certainly are not clear and convincing evidence. And even if you look, even with the interrogatory... Do you agree it was reduced to practice prior to the critical date? It just, and that was the whole point of them filing the patent application there. The problem is Facebook, at trial, actually didn't. Remember, because the critical date is right at the time the application was filed and the barring activity in that few days window is just before, Facebook, at trial, was arguing that the invention was ready for patenting for purposes of the barring activity, but was not enabled for purposes of giving us the benefit of the provisional, under which we easily would have won. Which, I think, is another reason that Facebook really tried not to prove its case too meticulously here, because in addition to being wrong, it was really on the horns of a dilemma there, between whether it was ready for patenting for the one purpose or the other. Either way, we should have won. They have a factual way to distinguish that, but it's dicey. So, that's why I didn't have evidence. I know I'm well over. If you wanted me to also respond to the method point, I could. No, I think we've heard your case. Thank you, Mr. Joseph. I'll take the case under advisement. Thank you. Thank you. Thank you.